Jeffrey Kerr (D.C. Bar Number 420323)
PETA Foundation
1536 16th St. NW
Washington, DC 20036
Telephone: 202-540-2171
Fax: 202-540-2208
E-Mail: JeffK@petaf.org

Martina Bernstein (D.C. Bar Number 994435)
PETA Foundation
1536 16th St. NW
Washington, DC 20036
Telephone: 626-376-3744
Fax: 202-540-2208
E-Mail: MartinaB@petaf.org

Jared Goodman (D.C. Bar Number 1011876)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Telephone: 323-210-2266
Fax: 213-484-1648
E-Mail: JaredG@petaf.org

*Attorneys for plaintiff*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | |
|---|---|
| MELANIE SLOAN<br>1229 Independence Ave. SE<br>Washington, DC 20003, | Case Number: |
|         Plaintiff, | **CLASS ACTION COMPLAINT** |
|     v. | |
| SOUL CIRCUS, INC.<br>510 Whitehall St. SW<br>Ste. A<br>Atlanta, GA 30303-3722,<br>404-588-1235 | |
|         Defendant. | |

Plaintiff Melanie Sloan ("Plaintiff" or "Ms. Sloan"), upon personal knowledge as to herself and her own acts, and as to all other matters, upon information and belief, based upon the investigation of her counsel, alleges as follows:

## NATURE OF THE ACTION

1. Intending to exploit growing consumer concern about the treatment of captive animals used for entertainment – and to avoid the public relations backlash if the truth became known – Soul Circus, Inc. ("Defendant") falsely and misleadingly promotes itself as a champion of animal rights and producer of joyful entertainment that causes no harm to animals. As a result of Defendant's deception, conscientious consumers like Ms. Sloan are deceived into doing precisely that which they intend to avoid: supporting and perpetuating the abuse of animals through their purchasing choices.

2. To halt and remedy Defendant's unlawful practices, Ms. Sloan brings this action individually and on behalf of all persons similarly situated, pursuant to the Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*, for (a) treble damages, or $1,500 per violation, whichever is greater; (b) punitive damages; (c) an injunction against the unlawful conduct; (d) attorney's fees; and (e) other relief which the Court deems proper.

## JURISDICTION

3. This Court has subject matter jurisdiction pursuant to D.C. Code §§ 11-921 and 28-3905(k)(2).

4. This Court has personal jurisdiction over the Defendant pursuant to D.C. Code § 13-423(a)), because the claims for relief asserted herein arise from the Defendant's transacting business in the District of Columbia ("District"); Defendant is authorized to conduct, and in fact, does conduct, business in the District; Defendant has sufficient minimum contacts with the District or otherwise intentionally avails itself of the consumer markets within the District

through the promotion, sale, marketing, and/or distribution of its products and services in the District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## THE PARTIES

5.     Ms. Sloan is an adult resident of the District, and a "consumer" within the meaning and scope of the CPPA, D.C. Code § 28-3901(a) (2).

6.     Ms. Sloan is a partner and founding partner of Triumph Strategy, a crisis communications firm. Ms. Sloan also founded Citizens for Responsibility and Ethics in Washington, a non-profit organization dedicated to ensuring the integrity of government officials through legal action and public education. Ms. Sloan served as the organization's Executive Director from February 2003 to December 2014. Before then, she held the positions of Assistant United States Attorney in the criminal division of the United States Attorney's Office for the District, and Minority Counsel to the House Judiciary Committee, among other distinguished positions.

7.     Ms. Sloan has a strong commitment to protecting animals and does not patronize, or purchase tickets to, circuses, zoos, amusement parks, aquariums, or other businesses that do not have a record of properly caring for animals or that display wild animals such as elephants, lions and tigers, who cannot safely, humanely, and healthfully be kept in captivity.

8.     Ms. Sloan has suffered actual damages as a result of Defendant's unlawful trade practices described herein. Among other things, Ms. Sloan expended funds to buy tickets to Defendant's July 11, 2015 show that she otherwise would not have purchased.

9.     Defendant is a Georgia corporation with its principal place of business at 510 Whitehall Street, SW, Atlanta, Georgia 30303-3722. Defendant operates a touring circus troupe that performs under the name UniverSoul Circus. Defendant is a "person" within the meaning and scope of the CPPA, D.C. Code § 28-3901(a) (1), and a "merchant" within the meaning and scope

3

of the CPPA, D.C. Code § 28-3901(a) (3).

10.     At all relevant times, Defendant engaged in a "trade practice" within the meaning and

scope of the CPPA, D.C. Code § 28-3901(a) (6) by furnishing, making available, and providing

information about its shows, by, among other things, operating an Internet website under the

domain name of www.universoulcircus.com ("Website"); and by soliciting, offering for, and/or

effectuating, the sale of tickets for its shows.

## CLASS ACTION ALLEGATIONS

11.     This action is brought by Ms. Sloan individually and as a class action pursuant to Rule 23

of the D.C. Superior Court Rules of Civil Procedure ("Rule 23"), on behalf of all persons

similarly situated ("Class" or "Class Members").

12.     The Class consists of all residents of the District who, in the last three years, purchased

tickets to Defendant's shows because of Defendant's unlawful trade practices.

13.     Plaintiff may bring this action as representative of the Class because she meets all the

prerequisites enumerated in Rule 23.

14.     Nearly all factual, legal, statutory, and injunctive relief issues that are raised in this

Complaint are common to each of the Class Members and will apply uniformly to every member

of the Class. These issues include, without limitation:

    a.   whether Defendant represented that the acts and types of entertainment in its shows

    have a source, sponsorship, approval, certification, characteristics, and/or benefits that

    they did or do not have, in violation of the CPPA, D.C. Code § 28-3904(a);

    b.   whether Defendant represented that the persons and entities with whom Defendant

    contracted and who exhibited animals in Defendant's shows have a sponsorship,

    approval, status, affiliation, or certification that these persons or entities did or do not

4

have, in violation of the CPPA, D.C. Code § 28-3904(b);

c. whether Defendant represented that the treatment of animals exhibited in its shows and the vendors supplying entertainment for its shows met or meet a particular animal welfare and regulatory compliance standard or quality, but which in fact they did or do not meet, in violation of the CPPA, D.C. Code § 28-3904(d);

d. whether Defendant misrepresented material facts about its commitment to animal rights and opposition to the mistreatment of animals, and other facts about the manner in which animals exhibited in its shows were or are treated, which facts had or have a tendency to mislead, in violation of the CPPA, D.C. Code § 28-3904(e);

e. whether Defendant failed to state material facts, including the numerous violations of animal welfare laws and history of mistreatment of animals by vendors with whom Defendant contracted and contracts to exhibit animals in its shows, which failure tended or tends to mislead, in violation of the CPPA, D.C. Code § 28-3904(f);

f. whether Defendant used innuendo or ambiguity as to material facts regarding violations of animal welfare laws by vendors with whom Defendant contracts to exhibit animals in its shows, among other things, which had or have a tendency to mislead, in violation of the CPPA, D.C. Code § 28-3904(f-1); and

g. the extent of damages suffered by the Class Members and the appropriate measure of damages and other remedies afforded by the CPPA.

15. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class Members sustained damages arising out of the same wrongful conduct by the Defendant. Plaintiff and the Class Members were and are similarly or identically harmed by the same unlawful representations and omissions of the Defendant described herein.

16. The Class Members are so numerous that joinder of all of them is impracticable. During the period relevant to this Complaint, Defendant targeted tens of thousands of consumers in the District with television ads, promotions via emails, and billboards on bus stops and in Metro cars, among other things. Numerous of these targeted consumers were potentially exposed to, and harmed by, the unlawful trade practices complained of herein. Although the exact number and identities of the Class Members are currently unknown to Plaintiff, their identities may be ascertained through business records maintained by Defendant and by disseminating appropriate notices through the media and other channels.

17. Plaintiff will fairly and adequately represent the interests of the Class and she is not aware of any difficulty in the management of this action as a class action. Plaintiff has no interest that is contrary to, or in conflict with, the interests of the prospective Class Members whom she seeks to represent.

18. Furthermore, because the monetary damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it virtually impossible for such Class Members to each seek redress individually for the wrongful conduct alleged.

19. This class action is moreover proper under Rule 23 because the prosecution of separate actions by individual Class Members would create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant; or (b) adjudications with respect to individual Class Members that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

20. This class action is moreover proper under Rule 23 because Defendant acted or failed to

act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as whole.

21.     This class action is moreover proper under Rule 23 because the questions of law and fact common to the Class Members, such as are described in paragraph 14, predominate over any questions affecting only individual Class Members; and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

22.     This action would be manageable as a class action.

WHEREFORE, Plaintiff respectfully prays that this Court certify this case as a class action and allow this case to proceed in accordance with such certification, with Plaintiff given leave to amend this Complaint as necessary to effectuate the claims of all Class Members.

## STATUTORY FRAMEWORK

23.     The purpose of the CPPA is to provide a just mechanism to remedy improper trade practices, to deter the continuing use of such practices, and to promote fair business practices throughout the District's community. *See* D.C. Code § 28-3901(b)(1) and (2).

24.     The CPPA grants Ms. Sloan and the Class Members an enforceable right to truthful information from merchants about goods and services that are or would be purchased or received by them in the District. *See id.* § 28-3901(c).

25.     It is a violation of the CPPA, "whether or not any consumer is in fact misled, deceived or damaged thereby," for any person to, among other things:

a.   represent that its services have a source, sponsorship, approval, certification, characteristics, and/or benefits that they do not have, *id.* § 28-3904(a);

b.   represent that persons have a sponsorship, approval, status, affiliation, certification, or connection that the persons do not have, *id.* § 28-3904(b);

7

    c.   represent that its services are of particular standard or quality, when, in fact, they are of a different standard or quality, *id.* § 28-3904(d);

    d.   misrepresent material facts which have a tendency to mislead, *id.* § 28-3904(e);

    e.   fail to state material facts, which failure tends to mislead, *id.* § 28-3904(f); or

    f.   use innuendo or ambiguity as to material facts, which have a tendency to mislead, *id.* § 28-3904(f-1).

26.    Additionally, "the CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions." *Osbourne v. Capital City Mortgage Corp.,* 727 A.2d 322, 325-26 (D.C. 1999).

## DEFENDANT'S TRADE PRACTICES

27.    In recent years, there has been increased public criticism and consumer backlash against the outdated and cruel practice of forcing captive animals to perform "tricks" in circuses, in particular with respect to animals that are not domesticated and, as a result, suffer greatly from being held in captivity and touring with a traveling circus, such as elephants, lions, and tigers.

28.    As a result, Defendant has been subjected to public scrutiny and consumer pressure for including animals in its circus acts, and it received appeals from thousands of ordinary citizens as well as from high-profile personalities and public officials to stop using animals in its shows, and to sever ties with vendors with a known record of animal welfare violations.

29.    For example, in April 1999, world-renowned primatologist Dr. Jane Goodall appealed to Defendant "to end the senseless exploitation of chimpanzees," saying that animals in circuses "live out their lives in inhumane, lonely, and unnatural settings in the name of entertainment."

30.    In November, 2003, internationally acclaimed singer and actress Olivia Newton-John published a letter urging Las Vegas officials to "follow the lead of California authorities and

prohibit the [Defendant's] circus from featuring its kangaroo boxing routine," stating that she

found it "appalling that tethered kangaroos are taunted into defending themselves as an oddity

for a UniverSoul Circus act."

31.     In February 2013, the animal rights organization People for the Ethical Treatment of

Animals ("PETA") issued an action alert about Nosey the elephant, scheduled to appear at an

upcoming show by the Defendant, urging concerned citizens to contact the Defendant and to

"*politely* ask them to cancel Nosey's appearances immediately." (emphasis in original) PETA

stated that "[d]espite the fact that Nosey the elephant is suffering from decades of neglect and a

painful, untreated skin condition, UniverSoul Circus is still forcing her to perform in tomorrow's

upcoming show in Tallahassee." According to a court filing by the Defendant, it received so

many comments in response to PETA's post, that it "was forced to shut down its Facebook page

and corporate website."

32.     At or about this same time, American business magnate Russell Simmons also sent a

letter to the Defendant, urging it to cancel performances of Nosey, noting that the vendor with

whom Defendant had contracted to exhibit Nosey, was a "known violator of federal law who has

shown utter disregard for animal welfare." Simmons posted this letter on his influential Global

Grind blog. An attorney for the Defendant later described to a Georgia judge that in response to

this posting, Defendant received "A HUNDRED THOUSAND COMMENTS" compared to the

average of 300-400 comments Defendant typically receives on its Website and Facebook page.

33.     In March 2015, Brooklyn Borough President Eric Adams sent a letter "on behalf of the

2.6 million Brooklynites who call this borough home" urging Defendant "to refrain from

bringing elephants into UniverSoul performances in Brooklyn and throughout New York City. . .

. New York City is a compassionate city and one that is becoming ever more wary of wild

animal performances, desiring to know these animals are instead safe to act out their natural behavior away from spotlight and loud noises."

34.     To avoid the enormous backlash and negative financial impact associated with the public outcry over the mistreatment of animals used for entertainment – most recently dubbed the "Blackfish Effect" – Defendant holds itself out as a protector of animal rights, and as being deeply concerned with safeguarding the welfare of animals.

35.     Among other things, Defendant has promoted its use of the common law trademark "CIRQUE DU SOUL," in an attempt to liken its particular brand of entertainment to that of "Cirque du Soleil," a world-famous producer of entertainment using human performers and eschewing the outdated exploitation of animals by circuses.

36.     Consistent with promoting itself as a brand of entertainment focused on human performances, during all relevant times, Defendant's Website showed almost exclusively images of human performers.

37.     The bottom of each page on Defendant's Website provides a link under the heading "Animal Rights." By clicking on the link, consumers are directed to a webpage titled UNIVERSOUL CIRCUS ANIMAL RIGHTS POLICY STATEMENT ("Animal Rights Statement," attached hereto as Exhibit A).

38.     The Animal Rights Statement includes the following representations:

    a.    "The UniverSoul Circus is committed to the proper treatment of animals."

    b.    "We strongly oppose any form of cruelty or mistreatment of animals, wild or domestic[.]"

    c.    "[We] will not tolerate any mistreatment on our circus site."

    d.    "In over 19 years and more than 10,000 performances, none of our animal vendors

have ever been cited for animal abuse while performing at the UniverSoul Circus."

e.  "UniverSoul Circus understands and supports all efforts to monitor and regulate the treatment of animals."

f.  "We work closely with local, state and federal agencies to ensure that our commitment to a high standard of animal care is upheld."

g.  "Any and all animal acts that perform with the circus must be in compliance with federal, state and local authorities."

h.  "The UniverSoul Circus will continue to deliver high quality, family friendly entertainment that brings joy, happiness and laughter to audiences around the world."

39.  These claims are misleading if not outright lies.

40.  There are few market restraints on Defendant's deception because many consumers have little access to accurate and complete information about how animals are treated "behind the scenes" – including how they are trained, housed, and transported, and whether they receive adequate food, shelter, exercise, environmental enrichment and medical care.

41.  Furthermore, the animals in Defendant's shows are exhibited pursuant to licenses issued to outside vendors ("Defendant's Vendors") whose identities and contractual relationships are unknown to the average consumer. Defendant's Vendors – rather than Defendant – are therefore the entities subject to citations for violating animal welfare laws. Since the Defendant is not even allowed by law to exhibit these animals (and instead must rely on outside contractors), its boast of a spotless record of compliance with the laws relating to exhibition of animals is inherently deceptive.

42.  Consumers are deceived not only by outright lies about Defendant's own conduct but by Defendant's half-truths and deliberate ambiguities arising from the fact that animals in its shows

are "leased" and exhibited under contract with third parties. Indeed, some consumers, like Ms.

Sloan, may not even be aware that the Defendant still uses animals in its shows, because during

the past few years, Defendant has scrubbed its Website clean of virtually all images of animals,

and the only explicit references to animals appear in its Animal Rights Statement.

## FACTS ABOUT DEFENDANT'S BUSINESS AND THE MISTREATMENT OF ANIMALS USED IN DEFENDANT'S SHOWS

43.     Defendant does not possess a license from the U.S. Department of Agriculture

("USDA"), which is required by the federal Animal Welfare Act ("AWA") in order to exhibit

animals in circuses, among other things.

44.     Defendant instead "leases" animals from outside vendors who are USDA licensees. In the

past, Defendant's Vendors included (among others, whose identities are presently not known to

the Plaintiff) Tarzan Zerbini Circus, Carson & Barnes Circus, Kay Rosaire, Rosaire-Zoppe

Chimps, Mitchel Kalmanson, Jorge Barreda, Hugo Liebel, Terranova Enterprises, Larry Carden,

Jennifer Caudill (a/k/a Jennifer Walker), Lancelot Kollman Ramos, and George Hanneford III.

45.     Defendant's Vendors have repeatedly violated the AWA and received citations from the

USDA for, among other things

> a.   failing to provide adequate medical care,
>
> b.   failing to provide sufficient shelter and protection from the elements,
>
> c.   failing to provide sufficient space to stand upright and move,
>
> d.   failing to provide exercise,
>
> e.   failing to provide environmental enrichment,
>
> f.   failing to feed an adequate diet,
>
> g.   failing to use proper procedures and instructions for transport and handling, and
>
> h.   failing to hire adequately trained and sufficient personnel necessary for the

protection and care,

of animals exhibited in Defendant's shows. *See* USDA Inspection Reports issued to Defendant's Vendors for violating the AWA while touring with the Defendant, attached hereto as Exhibit B.

46.     Furthermore, Defendant was not unaware or caught off guard by the mistreatment and neglect of animals by Vendors who exhibited in Defendant's shows – in light of the fact that those same Vendors received numerous citations from the USDA for violating the AWA while touring with other circuses and while keeping animals at their own facilities. *See* USDA Inspection Reports issued to Defendant's Vendors while not touring with the Defendant (partial compilation, by way of example only), attached hereto as Exhibit C.

47.     Although Defendant has attempted to obfuscate, hide and deny the misconduct of the Defendant's Vendors, as well as its own misconduct and its own failures to protect the welfare of animals exhibited in its shows, information currently available to the Plaintiff includes the information described below, as well as documented in Exhibits B, C and D, attached hereto.

48.     While touring with the Defendant, Defendant's Vendors Jorge and Louann Barreda ("the Barredas") typically keeps elephants chained by one leg twenty-four hours a day aside from their brief performances. The chains are not long enough for the elephants to turn around or lie down.

49.     At performance venues, Defendant's Vendor the Barredas typically keep elephants chained under a small green canopy that fails to protect the elephants from the elements.

50.     While touring with the Defendant, Defendant's Vendor the Barredas have been frequently observed striking and jabbing at elephants with sharp, steel-tipped, fire-poker-like bullhooks, metal poles, and pieces of plywood, in order to get the elephants to obey. Bullhook use on the elephants is particularly common when the Barredas are re-chaining the elephants following performances.

51.     Defendant has been an outspoken supporter of the use of bullhooks and opposed efforts to outlaw bullhooks and other tools designed to inflict pain to get elephants to obey.

52.     The three elephants Defendant leased from Defendant's Vendor the Barredas frequently suffer from diarrhea but they are still forced to perform in this condition in Defendant's shows.

53.     During various times during the past 18 months, Defendant exhibited elephants who tested reactive to tuberculosis. Under the U.S. Animal Health Association's *Guidelines for the Control of Tuberculosis in Elephants*, such animals should be prohibited from all travel and public contact for a minimum of 12 months.

54.     During various times over the past decade, including in 2013, Defendant contracted with Mitchel Kalmanson to "lease" tigers for Defendant's shows. While touring with the Defendant in 2013, no trained or experience tiger handlers traveled with the Defendant. Instead, Defendant's untrained lot crew was tasked with feeding the animals, transferring them from cage to cage, and moving them around for use in a magic act.

55.     During Defendant's 2013 tour, tigers were used for magic tricks in which the animals were compressed down under a false small bottom in a small gage or compressed into a false rear cage wall. Another trick required a tiger to be suspended in the air in a small plexiglass box. Each act required the tigers to be compressed for about 15 minutes at a time (for two performances a day during the week, and up to three performances a day on weekends).

56.     During Defendant's 2011 and 2012 tours, a handler named John Jairo presented tigers in a tiger act. During one performance while Jairo was turned towards the audience, a tiger got down off a pedestal and approached Jairo in a deliberate, crouched, predatory posture. The audience alerted Jairo, who turned around and whipped the tiger into submission until the cat return to the pedestal.

57.     Typically, Defendant's Vendor Kalmanson keeps the tigers used for Defendant's shows contained in small cages without ever providing them with access to an exercise pen at any of the performance venues.

58.     While touring with the Defendant in Dallas, Texas in the summer of 2012, one tiger was seen vomiting in a cage while housed outside in the sweltering Texas heat. In hot weather, big cats – who are typically housed outside in metal cages – were frequently observed putting their paws in their drinking water in what appears to be a desperate attempt to cool off. In the extreme heat, tigers have been observed panting heavily and exhibiting extreme lethargy.

59.     Reportedly, at least some of the tigers exhibited by the Defendant have undergone the cruel procedure of "declawing," which involves not merely removing the claws, but amputating the last bone of each toe. If performed on a human, this procedure would be the equivalent of cutting off each finger at the last knuckle.

60.     In March 2014, New York City officials denied Defendant a permit to exhibit three tigers and three elephants on the grounds that the tiger cages did not allow the animals adequate room to move and the elephants had not received required tuberculosis tests. The tigers were allowed to be exhibited only after the Defendant improved their unacceptable conditions two weeks later.

61.     In October and November 2013, the USDA was repeatedly thwarted in its attempts to inspect Defendant's Vendor Pascale Freeman while touring with the Defendant.

62.     In July 2013, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by failing to handle four tigers and one cougar in a manner so as to assure the safety of the animals and the public, and for a repeat violation of the AWA by failing to house the tigers and cougar in cages that would allow the animals adequate space to stand up and move, while touring with the Defendant.

63.     In April 2013, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by failing to provide adequate veterinary care for a tiger, improperly handling a tiger, and failing to provide adequate space and exercise to tigers, while touring with the Defendant.

64.     In April 2013, the USDA cited Defendant's Vendor Freeman for violating the AWA by exhibiting animals without a license and thereby putting the welfare of the animals at risk, while touring with the Defendant.

65.     In March 2013, the USDA issued an order to Defendant's Vendor Hugo Liebel, requiring him to "cease and desist from violating the [Animal Welfare] Act" and assessed a civil penalty of $7,500 against Liebel. According to USDA records, Liebel, among other violations, repeatedly has failed to provide adequate veterinary care to an elephant named Nosey over a 20-year period and also has chained her so tightly that she could barely move. Notwithstanding Liebel's long known history of abuse, Defendant contracted with Liebel to exhibit Nosey in Defendant's shows several times, including in February, 2013.

66.     In November 2012, a trailer transporting animals to Defendant overturned on an interstate in Georgia and trapped several animals who needed to be rescued by firefighters using the Jaws of Life to free them. Two llamas were injured. The driver was charged with driving too fast for conditions, failing to maintain his lane, and not having the proper class driver's license.

67.     In August 2012, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by failing to feed tigers the diet outlined by the veterinarian, while touring with the Defendant.

68.     In October 2011, the USDA issued an official warning to Defendant's Vendor the Barredas for repeatedly violating federal regulations. During previous inspections, the Barredas was cited for failing to establish and maintain a program of adequate veterinary care for four elephants, while touring with the Defendant.

16

69.     In August 2011, the USDA cited Defendant's Vendor the Barredas for repeat violations

of the AWA by failing to maintain a program of adequate veterinary care for four elephants,

while touring with the Defendant.

70.     In July 2011, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by

failing to handle a tiger in a manner that prevents "behavioral stress and unnecessary discomfort"

and failing to maintain facilities so that there is no risk of injury to animals, while touring with

the Defendant.

71.     In April 2011, the USDA cited Defendant's Vendor the Barredas for violating the AWA

by failing to provide adequate veterinary care to four elephants, while touring with the

Defendant.

72.     In February 2011, the Georgia Department of Natural Resources determined that

Defendant's Vendor, the Barredas, allowed a public official to ride an elephant in violation of

state law, while touring with the Defendant.

73.     In February 2008, the USDA issued a Consent and Decision Order against Defendant's

Vendor Kalmanson, ordering him to "cease and desist and continue to refrain from violating the

[Animal Welfare] Act," and for failing to have "a sufficient number of adequately trained

employees to maintain the professionally acceptable level of husbandry practices set forth in the

Act," among other violations. Those violations occurred while Kalmanson toured with the

Defendant. USDA also assessed Kalmanson a civil penalty of $6,000 for those violations.

74.     In June 2007, the USDA cited Defendant's Vendor Terranova Enterprises for violating

the AWA by failing to protect animals from exposure to potentially harmful chemicals, while

touring with the Defendant.

75.     In June 2006, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by

failing to provide veterinary care to a lion, while touring with the Defendant.

76.     In May 2005, the USDA cited Defendant's Vendor Carson & Barns for violating the AWA by failing to provide elephants with adequate shelter from the elements, while touring with the Defendant.

77.     In June 2004, the USDA cited Defendant's Vendor Kalmanson for violating the AWA because its handlers did not have (or did not know) protocols for handling, capturing and restraining animals; its personnel lacked guidance on how to handle and immobilize tigers as a means of preventing injury to the animals; barriers were inadequate to protect the public and the tigers from harm; and there were not enough personnel caring for the tigers to ensure the safety and wellbeing of the animals, while touring with the Defendant.

78.     In June 2004, during an inspection of the Defendant in Landover Hills, Maryland, Prince George's County Animal Management Division observed two tigers fighting. One tiger escaped and attacked an elephant, biting her on the hip.

79.     In May 2004, the USDA cited Defendant's Vendor Carson & Barnes for violating the AWA by failing to handle elephants in a manner that prevents "harm to the animals and the public," while touring with the Defendant.

80.     In December 2003, the USDA opened an investigation into Defendant's Vendor Javier Martinez, following two kangaroos' deaths within a four-month period. The investigator noted that "there remain a number of questions and concerns regarding the kangaroos, their medical treatment and handling that either have not been answered or that have not been answered satisfactorily."

81.     In October 2003, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by failing to provide proper veterinary care to a tiger who had an open wound on his forehead,

and failing to properly handle food for the animals, while touring with the Defendant.

82.    In October 2003, the Oakland Police Department and the California Department of Fish and Game denied a permit for Defendant to exhibit kangaroos in a "boxing act" after determining that it violated state cruelty-to-animals laws.

83.    In June 2003, Defendant's Vendor William Woodcock told a USDA official, "If I get any defiance [from the elephants], I'll beat the hell out [of] them. [The elephants] will disobey in public because they know I can't hit them with the stick as much."

84.    In August 2002, the USDA cited Defendant's Vendor Kalmanson for repeat violations of the AWA by failing to provide a veterinary-approved diet to tigers, while touring with the Defendant.

85.    In March 2001, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by improperly storing animal food, failing to have any exercise plan for a poodle used in a magic act, and failing to keep veterinary care and other records required by the AWA, while touring with the Defendant.

86.    In April 2000, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by failing to provide veterinary care, housing the animals in cages that were too small (barely half the minimum floor space required by the AWA); and failing to provide the required enrichment, while touring with the Defendant.

87.    In March 1998, the USDA cited Defendant's Vendor Kalmanson for violating the AWA by failing to provide exercise for lions, while touring with the Defendant.

88.    In March 1998, the USDA also cited Defendant's Vendor Kalmanson for violating the AWA by failing to have a program of veterinary care, and by keeping lions in cages that were so small that the lions could not even stand upright, while touring with the Defendant.

## PROMOTION AND PURCHASE

89.     On selected dates from June 24 through July 16, 2015, Defendant performed shows at the National Harbor in Prince George's County, Maryland, just south of the District.

90.     Defendant advertised, promoted and offered for sale tickets to those shows by specifically targeting consumers in the District through television commercials, bus stop and Metro billboards, as well as Internet promotions, including on the www.groupon.com and www.thecapitoldeal.com websites and mass-emails promoting ticket sales under the heading "UniverSoul Circus Comes to D.C."

91.     A "slideshow" that accompanied the www.thecapitoldeal.com promotion contained photographs featuring exclusively human performers. Under the heading "WHY WE LOVE IT," the promotion stated that "Artists include dancers, trapeze artists, clowns, magic acts motorcycle stunts and more." The promotion contained a link to Defendant's Website "for more details."

92.     On June 11, 2015, Ms. Sloan received a promotional email titled "Washington DC Deals," that offered tickets to Defendant's shows for the June 24 to July 16, 2015 period. The email contained no images or other references that would suggest to a reasonable consumer that the advertised shows include animals.

93.     After visiting Defendant's Website and reviewing the Animal Rights Statement, Ms. Sloan was falsely reassured by Defendant's statements and omissions and in reliance thereon, purchased four tickets for herself, her daughter and two friends, to see Defendant's July 11th 3:30 p.m. show.

94.     But for Defendant's statements and omissions, Ms. Sloan would not have made this purchase. Ms. Sloan suffered an injury in fact by losing the money associated with her purchase and by supporting what, absent Defendant's misrepresentations and omissions, Ms. Sloan would

have correctly understood to be the inhumane and improper treatment of highly intelligent wild animals not suitable for performing tricks in circuses, which Ms. Sloan strongly opposes.

95.     On June 22, 2015, Ms. Sloan received an email from a friend informing her that Defendant had a long history of contracting with vendors who have been cited for violating the AWA. Because Ms. Sloan did not want to support a circus that contracts with vendors who mistreat animals and violate animal welfare laws, and because Ms. Sloan wants to teach her daughter about the humane treatment of animals, she decided not to attend the July 11 show.

96.     The July 11 show included acts with elephants and tigers, among other animals, exhibited by Defendant's Vendors who have been cited repeatedly by the USDA for violating the AWA and who have otherwise mistreated and neglected the animals exhibited at Defendant's shows.

## COUNT I
## VIOLATIONS OF THE CPPA

97.     Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

98.     During the three-year period at issue in this Complaint, Defendant engaged, and continues to engage, in unlawful trade practices by:

> a.   representing that its services have a source, sponsorship, approval, certification, characteristics, and/or benefits that they do not have, in violation of the CPPA, D.C. Code § 28-3904(a);

> b.   representing that persons engaged by, or exhibiting with, Defendant have a sponsorship, approval, status, affiliation, certification, or connection that the persons do not have, in violation of the CPPA, D.C. Code § 28-3904(b);

> c.   representing that Defendant's services are of particular standard or quality, but which in fact, are of a different standard or quality, in violation of the CPPA, D.C.

21

Code § 28-3904(d);

    d.   misrepresenting material facts which have a tendency to mislead, in violation of

the CPPA, D.C. Code § 28-3904(e);

    e.   failing to state material facts, which failure tends to mislead, in violation of the

CPPA, D.C. Code § 28-3904(f); and

    f.   using innuendo and ambiguity as to material facts, which have a tendency to

mislead, in violation of the CPPA, D.C. Code § 28-3904(f-1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself as an individual, and on behalf of the Class,

respectfully prays that this Court enter judgment against Defendant and grant relief pursuant to

the CPPA, D.C. Code § 28-3905, as follows:

(A) ordering Defendant to pay to Plaintiff and to the Class, treble damages, or $1,500 per

violation, whichever is greater, together with pre-judgment and post-judgment interest thereon;

(B) awarding Plaintiff the costs, expenses and attorney's fees incurred in this action;

(C) ordering Defendant to pay to Plaintiff and to the Class punitive damages as

appropriate;

(D) entering an injunction against the use of Defendant's unlawful trade practices; and

(E) granting such other relief which the Court deems just and proper.

Plaintiff demands a trial by jury as to all issues herein.

Respectfully submitted,

Date: 8/10/15

Jeffrey Kerr (D.C. Bar Number 420323)
PETA Foundation